MERRITT–CHAPMAN & SCOTT CORPORATION, Plaintiff,

v.

PUBLIC UTILITY DISTRICT NO. 2 OF GRANT COUNTY, WASHINGTON, Defendant.

United States District Court
S. D. New York.
Feb. 3, 1965.

Cleary, Gottlieb, Steen & Hamilton, New York City (William L. Lynch, James W. Lamberton, New York City, of counsel), for plaintiff.

Root, Barrett, Cohen, Knapp & Smith, New York City, Washington & Wickwire, Ephrata, Wash. (Whitman Knapp, New York City, Nat W. Washington, Ephrata, Wash., William J. Quirk, Paul R. Herman, New York City, of counsel), for defendant.

RYAN, Chief Judge.

This suit seeks monies alleged to be due on a public works contract dated July 9, 1956 between plaintiff Merritt-Chapman & Scott Corporation, a Delaware contractor with principal offices in New York City, and defendant Public Utility District No. 2 of Grant County, Washington, a municipal corporation established under the laws of the State of Washington.

Suit was filed in the New York Supreme Court, New York County. A warrant of attachment issued on March 7, 1962. A levy was made upon certain

funds on deposit with Bankers Trust Company, in New York City, for the account of the District. Service of the summons and verified complaint was subsequently made upon the District at Coulee City, Washington.

On March 26, 1962 the defendant District removed the suit to this Court on ground of diversity of citizenship.

Prior to answer the District moved to vacate the warrant of attachment and the levy thereunder and to set aside the service of summons on the ground that the funds on deposit with the Bank are immune from attachment levy under the doctrine of governmental immunity, or, alternatively, are trust funds and therefore not properly subject to attachment. The District Court vacated the levy and set aside the service of summons because it found the activities of the District to be "governmental" and not "proprietary", and accordingly held the District entitled to immunity. The Court of Appeals (319 F.2d 94) sustained the District Court's finding that the funds in question were devoted to "governmental" purposes. It ruled, however, that a levy under an attachment in a quasi-in-rem proceeding against an out-of-state governmental instrumentality will be permitted to stand unless its effect will substantially interfere with the public duties of such instrumentality. Neither the District Court nor the Court of Appeals passed upon the trust fund theory. The motion to vacate the attachment and service of process was remanded for further proceedings in this Court.

Subsequently and on further hearing, additional depositions and affidavits were submitted to this Court. The Public Utility District then too, advanced the theory that the New York Supreme Court and therefore this Court did not have jurisdiction over the subject matter of the action because the contract sued upon was not made in New York.

We have before us the following three questions:

1. Will the levy upon the funds substantially interfere with the fulfillment by the District of its essentially public functions?

2. Was the contract sued upon made in New York so as to give this Court jurisdiction over the subject matter?

3. Were the funds sought to be attached property of the District, or held in trust?

We find that the attachment will not substantially interfere with the fulfillment of the District's public functions; that this court has subject matter jurisdiction because the contract sued upon was made in New York; and that the Construction and Construction Interest Funds are held in trust and therefore, are not property of the defendant. The attachment must be vacated.

■ I. *The attachment will not substantially interfere with the fulfillment by the District of its essentially public functions.*

We are concerned here with the attachment of two funds which were provided for by District Bond Resolution 313. Bonds were sold pursuant to this Resolution to finance the construction of a dam in the State of Washington known as the Priest Rapids Project and from the proceeds of the sale the two funds were set up. According to the Resolution (section 13), "the monies in the Construction Interest Fund shall be used for payment of interest on the Bonds during the period of construction of the Production System." When the project is complete, any remaining money in the Interest Fund is to be transferred to the Construction Fund. The Construction Fund is to be used for the "cost of acquisition and construction of the Production System." (These costs are enumerated in detail in section 14 of the Bond Resolution). When the Production System is complete, any remaining monies not needed for the construction are to be transferred from the Construction Fund to the Bond Fund, which is established for redemption of the bonds. The funds which have been levied upon are to be used to pay the

costs of construction, to pay interest during the period of construction, and to redeem the bonds.

The Court of Appeals (supra p. 112) stated that there was evidence "that on September 28, 1961, the District's Construction Engineer certified to the District that construction by the Contractor was complete * * *". According to the Court, however (supra p. 113):

"Despite the fact that the principal construction work has been completed by the Contractor, there may well be relevant work still to be done by others, payments to whom are provided in the Construction Fund. The navigation and flood control features have certainly not been completed and certain preliminary work may well have been done, payments for which may well involve the Construction Fund. The affidavits of the District tell us that the Corps of Engineers 'is still acting as the land acquisition agency for the District,' but it is far from clear whether there is any relation between such work and the Construction Fund. Provision is made for payments to other persons listed under the Construction Fund, such as the administrative staff, engineers, trustees and others performing various functions. Whether or not they have been paid does not appear. Data relative to interest payments is lacking and there is nothing to show what will be the significance, if any, of preventing surplus funds from moving to the Reserve account in the Bond Fund. * * *"

Because the Court did not have before it sufficient data to decide the above questions, it remanded the case to us so that the parties would be able "to submit further affidavits or a stipulation of facts". (supra p. 104) In light of this fresh evidence, we are to decide if payments remain to be made from the Construction and Construction Interest Funds, and if the attachment will prevent the making of these payments. We are also to determine if redemption payments from the Reserve account of the Bond Fund will be obstructed due to its failure to receive surplus monies from the attached funds.

We find that the attachment will not prevent the making of necessary and legitimate payments from any of these funds. As we have noted, the District's Construction Engineer certified to the District that construction by the contractor was complete save only in minor respects. He certified in these words:

"This will certify that the work required to be done by MC & S Corporation under contract documents 138–2 * * * has been completed and is found after inspection to be acceptable, with the exception of certain damaged or defective items * * *." (Letter dated September 28, 1961 from Harza Engineering Company to Public Utility District No. 2).

This certificate was issued pursuant to paragraph 5 of contract documents 138–2, the contract between plaintiff and defendant, which provides that "upon receipt of written notice that the work is completed, the Engineer will promptly make an inspection and when the work is found complete and acceptable under the contract, the Engineer will promptly issue a Completion Certificate * * * stating that all of the work provided for in this contract has been satisfactorily completed under the terms and conditions thereof * * *." On December 4, 1961, the Engineer, Harza Company, wrote a letter to plaintiff and sent a copy to the District, confirming that its September 28, 1961 letter "was issued by us to Public Utility District No. 2 of Grant County, Washington as a Completion Certificate under paragraph 5 of your contract with the Public Utility District." In a letter to the District on January 2, 1962, Harza stated:

" * * * as your Engineer, charged with certain responsibilities under our contract with you and your contract with MC & S, we feel it our duty to reiterate our reasons for

issuing our Certificate of Completion on September 28, 1961: The Project was then in full operation, the District was receiving all of the power and other benefits for which the Project was designed and built, the items excepted in the Certificate did not interfere with the successful operation of the Project * * * and the amount involved was extremely small for a Project of this size * * *."

By the spring of 1963, these unresolved items had been disposed of and Harza issued the Final Certificate. The Final Certificate certified that "all the work provided for in the Contract Documents 138–2 is satisfactory under the terms and conditions thereof." The Project was dedicated in the Spring of 1962, and there is also evidence that it has been in full commercial operation since as early as July 31, 1961. We conclude that the record shows that the Project has been completed.

In his affidavit, E. B. Gibbons, an officer of defendant, states that as of the date of the attachment, there remained to be paid from the Construction Fund approximately five million dollars for services rendered in connection with the construction by parties other than plaintiff. It appears, however, that some of the expenses set out in Schedule III of this affidavit should not be paid from the Construction Fund, but rather should be disbursed from the Revenue and Renewal and Replacement Accounts of the Bond Fund. Once the construction of the Project has terminated, costs for operating, repairing, and extending the Project are to be paid from these funds. Section 10(c) of the Bond Resolution sets up a Revenue Fund of three million dollars. Section 19 states that this amount plus

"all income, revenues, receipts, and profits derived * * * through the ownership and operation * * * of the Production System * * * shall be used and applied * * * solely for the purpose of operating and maintaining the Production System and paying all costs, charges, and expenses in connection therewith and for the purpose of making repairs, renewals and replacements to said Production System and constructing additions and extensions thereto and betterments thereof * * *."

Section 22 of the Bond Resolution creates a Renewal and Replacement Fund. Funds from the Revenue Fund are gradually transferred here and are also used to pay the cost of renewals, replacements, extensions, and improvements to the Production System. Zinder Brothers, Consultant Engineers for the Project, in their report dealing with the operations of the District through August 31, 1963 stated:

"No moneys derived by operations of the Production System have been expended for extensions and betterments normally chargeable to capital accounts. All such additions have continued to be paid from the Construction Fund."

Even if there were approximately five million dollars left to be paid out of the Construction Fund as of the date of the attachment, we find that all such payments can be made from the unattached part of the funds. When the attachment was issued on March 7, 1962, the Construction Interest Fund contained $4,799,152 and the Construction Fund $18,891,051. Plaintiff subsequently stipulated to reduce the levy upon the Construction Fund to fifteen million dollars. Almost $3.9 million was left in the Construction Fund free of the attachment. As of July 31, 1964, $2,561,223, or more than one-half of the amount allegedly due from the Construction Fund to persons other than plaintiff, had been paid out of the Fund. Despite these payments, due to interest earned, the Construction Fund still contained $17,365,516, and the Construction Interest Fund had grown to $5,125,218. All interest earned by reason of the investment of the Interest Fund is to be deposited in the Construction Fund. (Section 13 Bond Resolution).

In addition, according to Section 17 of the Resolution, after the Construction Engineer has filed the certificate of completion and after the District has accepted the Production System as completed and ready for continuous operation, the balance of the monies in the Construction Interest Fund are to be transferred to the Construction Fund. It is true that the District has not accepted the Production System, but as we have seen the Certificate of Completion has been filed and the System has been in continuous operation for two and one-half years. No payment has been made from the Interest Fund since October 21, 1961.

If the funds in the Construction Fund were to prove insufficient, the District would be free to use the monies in the Construction Interest Fund. Together with the unattached funds in the Construction Fund, this leaves $7.4 million which could be used to pay any remaining costs of construction.

We find that the evidence submitted reveals that there are no costs stemming from the construction of the Priest Rapids Project, which could not be satisfied from available funds. Some of the costs claimed to be still owing should be paid from the Bond Revenue Fund. Even so, the unattached funds in the Construction Fund are almost sufficient at this moment to pay all of the costs alleged and should be more than enough when interest earned is added to this account. Funds are also available from the Construction Interest Fund. Defendant has not shown us one payment stemming from the construction of the Project which could not be met from the Construction Fund. The Project has continued to function smoothly for more than two and one-half years despite the attachment.

The attachment of the Construction Interest Fund would not prevent payments from this fund because the construction has terminated and interest is only to be paid from this fund during the period of construction. Similarly, the attachment would not interfere with payments from the Reserve Account in the Bond Fund. It is clear that the attached funds are not needed in the Reserve Account in order to redeem the bonds. We have not been apprised of one instance where bonds payable could not be redeemed because of a lack of monies in the Bond Fund. There has not been any suggestion that the money in this fund will prove insufficient in the future.

II. *Subject Matter Jurisdiction.*

Defendant urges as a further reason for invalidating the attachment that this court lacks subject matter jurisdiction. Since both parties are foreign corporations, the state court's jurisdiction prior to removal was based on Section 225 of the New York General Corporation Law, McKinney's Consol. Laws, c. 23 (now Section 1314 of the Business Corporation Law, McKinney's Consol. Laws, c. 4—effective September 1, 1963) which provides:

*"Action against foreign corporation by another foreign corporation or non-resident*

"An action against a foreign corporation may be maintained by another foreign corporation * * * in one of the following cases only:

"1. Where the action is brought to recover damages for the breach of a contract made within the state * * *."

Plaintiff in its complaint alleges that the contract sued upon was made in New York, and defendant urges that it was made in the State of Washington. The history of the contract negotiations in the evidence before us appears as follows:

On February 8, 1956 the Commissioners of Public Utility District No. 2 of Grant County, Washington called for bids for the construction of the Priest Rapids Dam. This invitation for bids (consisting of 10 volumes of detailed documents) set forth verbatim the contract which defendant District was prepared to enter into with the successful bidder (contract documents 138–2) and

the form of the performance bond such bidder would be required to furnish. On March 12, 1956, plaintiff submitted its bid stating the price at which it was willing to enter into the above contract. Along with its bid, plaintiff gave a bond of 5 percent of the price bid as a guarantee that it would enter into a contract in accordance with its bid and would furnish a performance bond. Plaintiff's bid was the lowest of those submitted. On May 14, 1956, the District sent a letter to plaintiff which supplemented the procedures outlined in the invitation to bid. The letter stated that the District proposed to accept plaintiff's "bid and enter into formal contracts in the forms attached" subject to the conditions that the District shall have sold bonds sufficient to pay all costs of acquisition, construction, and ownership of the Project plus a stated amount for working capital and that no claim would arise against the District except against the proceeds of the bonds. In a letter dated May 18, 1956, sent from New York, plaintiff stated that the letter of May 14 "has been accepted and executed by us and our sureties." On June 25, 1956, in Washington, the District's Commissioners issued a resolution entitled, A Resolution Accepting The Bid of MC & S Corporation. In the course of this Resolution, the District stated that the "proposal of MC & S as supplemented and amended be accepted" and that the "District will accept the construction contract to be executed in New York, New York on July 9, 1956 * * *." Pursuant to this resolution, the formal contract, as set out in the original invitation for bids and as supplemented by the May 14 letter, was executed in New York on July 9, 1956.

Both parties state that a contract is deemed to have been made in New York if the "last act necessary for its formation" occurs in this State. Fremay Inc. v. Modern Plastic Corp. (1st Dept. 1961) 15 A.D.2d 235, 237, 222 N.Y.S. 2d 694, 697. Therefore, each party alleges that the contract was made where it deems the acceptance to have occurred.

It is defendant's contention that the District's June 25 Resolution, promulgated in Washington, was an acceptance of plaintiff's bid as supplemented by the letters of May 14 and May 18, 1956. According to defendant, there was a meeting of the minds at this moment as to all material terms of the contract. Plaintiff contends that there was no contract until the documents were signed in New York on July 9, 1956.

We find that the contract was made in New York. In coming to this conclusion, we have applied New York law. Since our jurisdiction of the persons is based on diversity of citizenship, we are compelled by the doctrine of Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, to apply New York law. The parties have not alleged that a New York court would apply the law of Washington or that that state's law is different.

New York has the rule that where parties manifest their assent to all the terms of a proposed contract, then the mere fact that the parties also manifest an intention to adopt a written memorial does not prevent there being a binding contract. Sanders v. Pottlitzer Bros. Fruit Co., 144 N.Y. 209, 39 N.E. 75, 29 L.R.A. 431; Disken v. Herter, 73 App.Div. 453, 77 N.Y.S. 300, affirmed without opinion 175 N.Y. 480, 67 N.E. 1081. Cf. Smith v. Onyx Oil & Chemical Co., 3 Cir., 218 F.2d 104, 105; Banking & Trading Corp. v. Floete, 2 Cir., 257 F.2d 765, 769.

The more recent New York cases, however, make it plain that if either of the parties manifests its intent not to be bound until a written contract is executed, then the parties are not bound until that event occurs. Schwartz v. Greenberg, 304 N.Y. 250, 107 N.E.2d 65; Clark v. J. & C. Auditore, Inc., 244 N.Y. 382, 155 N.E. 679; Boysen v. Van Dorn Iron Works Co., 94 App. Div. 95, 87 N.Y.S. 995; Smith v. Onyx Oil & Chemical Co., supra; Banking & Trading Corp. v. Floete, supra. As Judge Waterman pointed out in the

Banking & Trading Corp. case, supra, ultimately the decision depends upon an issue of fact.

We find that it is clear from the record before us that defendant District manifested an intent not to be bound until the formal execution of the contract and therefore, there was no contract until July 9, 1956 in New York.

This finding of fact is supported by the following considerations:

In the District's resolution of June 25, 1956, it was stated:

"* * * Merritt-Chapman & Scott Corporation be notified that the District will accept the construction contract to be executed in New York, New York on July 9, 1956."

This intent not to be bound until the execution of a formal contract is reinforced by the language which the District employed in their letter to MC & S on May 14, 1956:

"Your corporation agrees that no claim will arise against the District by reason of its call for bids, your bid, the terms of the forms of contract attached, or this letter except against the proceeds of said bonds, which shall be the sole source of payment for any claims whatsoever arising directly or indirectly by reason of the existence of any of said documents."

As already noted, another condition set forth in this letter was that the formal contract was not to be executed until the bonds in question had been sold. The sale of the bonds was completed on July 9, 1956, the same day that the contract was executed. Therefore, it is clear that according to the intent of the District, it was not to be bound prior to July 9, 1956 and consequently there was no contract before that date.

Pertinent sections of the Revised Code of Washington reveal that it is doubtful if the District even had the power to obligate itself to perform its part of the contract before entering into a formal agreement. Section 54.04.080 of this code states:

"At the time and place named, the bids shall be publicly opened and read, and the commission shall canvass the bids, and *may let* the contract to the lowest * * * bidder * * *. If the contract *is let*, all checks shall be returned to the bidders, except that of the successful bidder, which shall be retained until a contract is entered into and a bond to perform the work furnished * * *."

This language seems to permit the District when the bids are opened to agree to enter into a contract, but not to form a binding agreement to perform its part of the construction contract until a performance bond and formal contract are executed. We find that before being obligated the record shows that the District wanted to make sure that the bonds were sold, that a performance bond was given, and that a formal contract was executed. Therefore, the Resolution of June 25, 1956 cannot be deemed to be the last act necessary to form the contract sued upon. At most it created a contract agreeing to execute the contract which was "made" on July 9, 1956 in New York.

We hold that the Court has jurisdiction over the subject matter of the suit and thus to the question of jurisdiction over the defendant.

III. *We now consider whether the attached funds were held in trust and were therefore not property of the defendant.*

The Court of Appeals did not decide the trust question but specifically left it to our determination:

"In this posture of the case we think the wise course for us to pursue with reference to the trust feature of the litigation is to leave that for consideration by the District Court on the remand." supra p. 104.

The attachment of the two funds issued under Sections 902, 903 and 912

of the New York Civil Practice Act (now Section 6201 et seq.).[1]

Defendant argues that the funds are held in trust and are therefore, not "property of the defendant". We find that the Construction Interest and the Construction Fund are held in trust and therefore, are not "property of the defendant" subject to attachment.

Bond Resolution 313 designated the Bankers Trust Company Construction Fund Trustee to act as trustee of both funds. Bankers Trust received the monies by check from the underwriters drawn to its order. The functioning of these funds has been considered.

Both funds are valid trusts; both the District and Bankers Trust intended to create trusts.

In the Bond Resolution (section 11) it is provided that "the Bankers Trust Company, New York, New York, is hereby appointed as Construction Fund Trustee." Throughout, the Bond Resolution, "Bankers Trust" is repeatedly designated as "Construction Fund Trustee", (Sections 10, 11, 13–18), and it recognized that it was holding these funds as trustee. In a letter sent to the District on July 9, 1956, Bankers Trust stated:

" * * * We therefore, pursuant to section 11 of your Commission's Bond Resolution dated June 19, 1956 appointing us as Construction Fund Trustee, do hereby signify our acceptance of the duties and obligations imposed upon us by said

resolution as such Construction Fund Trustee."

The history prior to the sale of the bonds shows further that trusts were intended to be created. The underwriters would not undertake the issue unless the funds were placed in trust. There was a conflict between various officials of the State of Washington as to whether in accordance with Washington law, the funds were required to be placed with the treasurer of the county in which the utility district is located. Finally after much correspondence, between officials of the state and attorneys in Washington and New York, the Attorney General of Washington stated:

"RCW 54.24.050 specifically authorizes the resolution of the district which specifies that certain proceeds from the sale of the bonds are to be disbursed by trustees in the manner set forth therein."

We find that the powers given to the trustee were sufficient to carry out the intent to create trusts.

Plaintiff argues in effect that the purported creation of trusts is illusory, because Bankers Trust has performed insufficient duties and because the District has retained too much control over the disbursement of the funds. Plaintiff bases this contention on the fact that Bankers Trust has not made reports to bondholders, has not filed income tax returns, has no discretion as to when to pay out the monies in the funds, but may do so only when the Commission

---

1. "902. *In what actions attachment of property may be had.* A warrant of attachment against the property of one or more defendants may be granted upon the application of the plaintiff, as specified in the next section, in any action for the recovery of a sum of money only.

"903. *What must be shown to procure warrant of attachment.* To entitle the plaintiff to such a warrant, he must show that a cause of action specified in the last section exists against the defendant, and, if the action is to

recover damages for breach of contract, that the plaintiff is entitled to recover a stated sum * * *. He must also show that the defendant
   "1. Is either a foreign corporation or not a resident of the state;
* * * * *

"912. *Duties of sheriff in execution of warrant.* The sheriff must execute the warrant immediately, by levying * * * upon so much of the *property of the defendant, within his county* * * *."

of the District approves and directs payment from the Construction Fund.

It is true that the intent to create a trust and even the use of the word "trust" do not compel us to find that a trust has been created. (Matter of Schaefer, 121 N.Y.S.2d 233, N.Y.Sur., 1953; Denison v. Denison, 185 N.Y. 438, 78 N.E. 162, 1906; Jacoby v. Jacoby, 188 N.Y. 124, 80 N.E. 676 (1907); In re Cole's Will, 163 Misc. 102, 296 N.Y.S. 512 (1937); In re Curth's Will, Sur., 61 N.Y.S.2d 237 (1946); In re Bolton's Estate, Sur., 90 N.Y.S.2d 295 (1949). In the cases cited above, it was held that the purported trusts failed, because they were passive in that the "trustee" had no active duties, and therefore, was simply an agent of the settlor. The function of the purported trustee in these cases was simply to hold certain funds and to pay them over absolutely and unconditionally to another party at a certain time.

Here, Bankers Trust, however, has clearly defined administrative duties. It must invest the monies of the Construction Interest and Construction Funds in bonds or other general obligations of the United States Government, which mature in certain amounts at specified times from the date of purchase. All interest earned from such investments accrues to the Construction Fund. Bankers Trust is not paid for its services, but is allowed to treat the uninvested cash of the funds as part of its general banking deposits. In order to pay interest on the bonds during the period of construction it is provided that the Construction Fund Trustee shall transfer to the Bond Fund Trustee a sufficient sum to make sure that the next installment of interest is paid. (Section 13). Prior to disbursing monies from the Construction Fund, Bankers Trust is required to first make certain that the costs come within the categories set out in section 14. Section 15 provides that the payments must be approved by both the Commission of the District and the Construction Engineer. This section also requires that each order for construction costs contain the following information: the item number of the payment, the name of the person, firm, or corporation to whom the payment is due, the amount to be paid, that such obligation has been incurred by the District, is a proper charge against the Construction Fund, and has not been previously paid, and that no notice has been received of any lien on the right to receive such payment. The fact that the District approves and directs all payments from the Construction Fund is not enough to transform the trustee into a mere agent. A reservation by the settlor of a power and right to withdraw, consume, or dispose of the principal of a trust does not indicate that the trustee has no title to the trust corpus and that the trust has no effective existence (Pinckney v. City Bank Farmers Trust Co., 249 App.Div. 375, 292 N.Y.S. 835; Matter of Halpern, 303 N.Y. 33, 100 N.E.2d 120 (1951)).

We conclude that this trust is not passive. Bankers Trust has to make certain that the funds are disbursed and transferred in accordance with definite criteria set forth in the Bond Resolution. The test of the validity of a trust is whether the settlor in good faith has divested himself of ownership. It is clear that the District transferred ownership of these funds in good faith to Bankers Trust.

Plaintiff contends moreover, that the trusts fail because they are not limited as required by the Rule Against Perpetuities. This rule, however, does not apply to these trusts, because they are classified within the category of trusts for a Governmental or Municipal Purpose. (See Abridgement of the Law of Trusts, Austin Wakeman Scott, 1960, p. 675).

Title to the attached funds is in the trustee; they are not "property of a defendant" for purposes of Section 912; nor may these funds be attached

under Section 916, subd. 6 of the C.P. A. (now 6202 C.P.L.R.):

"The attachment may also be levied upon:

"6. A right or interest, present or future, of the defendant to or in any property or fund * * * held or controlled by a fiduciary * * * which could be legally assigned, released, or alienated by the defendant."

The defendant has no "right or interest, present or future" in the attached funds which it could legally assign, release, or alienate. Not only does defendant have no title to the funds, it has no beneficial or reversionary interest in them. Defendant is to receive no payment ultimately from these funds. It is provided in Section 17 of the Bond Resolution that when the Interest and Construction Funds terminate, the balance is to be transferred to the Bond Fund for bond redemption. At no time would defendant have any assignable right or interest in these monies which could be attached under the statute.

The same result follows under the new C.P.L.R. Section 6202 provides that:

"Any debt or property against which a money judgement may be enforced as provided in section 5201 is subject to attachment."

Section 5201(b) provides that:

"A money judgment may be enforced against any property which could be assigned or transferred, whether it consists of a present or future right or interest and whether or not it is vested * * *."

Section 5201(a) provides that:

"A money judgment may be enforced against any debt, which is past due or which is yet to become due, certainly or upon demand of the judgment debtor * * *."

For the reasons above, we conclude that defendant has no "property which could be assigned or transferred" either "present or future" vested or unvested. The attached funds are not a "debt which is past due or which is yet to become due, certainly or upon demand of the (judgement debtor)." defendant. The Construction Trustee owes no monies to the defendant. If the defendant were to make a demand for payment from the Construction Fund, it would be doing so on behalf of a beneficiary. The Bond Resolution was set up so that at no time would the defendant gain title to any of the funds placed in trust. It follows that the levy under the attachment was unauthorized and illegal because it was not made on property of the defendant. Since there is no question about the fact that defendant a foreign corporation is not doing business in this state, defendant's motion is granted and the service of summons is set aside.

Settle order on 5 days' notice.