257 F.2d 765
 BANKING & TRADING CORPORATION, Limited, also known as Perseroan Bank dan Perniagaan, Plaintiff-Appellant,
v.
Franklin G. FLOETE, as Administrator of General Services, Defendant-Respondent (Appellee).
 No. 95.
 Docket 24700.
 United States Court of Appeals Second Circuit.
 Argued January 7, 1958.
 Decided July 9, 1958.
 
 Delson, Levin & Gordon, New York City (Robert Delson, Murray C. Bernays, Lewis M. Dabney, Jr., Ellis J. Freedman, New York City, of counsel), for plaintiff-appellant.
 Charles R. L. Hemmersley, New York City (Abram Glaser, Max Hersh, New York City, of counsel), for defendant-respondent (appellee).
 Before HINCKS, LUMBARD and WATERMAN, Circuit Judges.
 WATERMAN, Circuit Judge.
 
 
 1
 The appellant, Banking & Trading Corporation, Ltd. (BTC), an Indonesian corporation, commenced this action in the district court to recover the price of a shipment of rubber which its agent Isbrandtsen Company on its behalf allegedly sold in 1947 to Rubber Development Corporation (RDC), an agency of the United States.[1] The cause was tried to the court, which rendered judgment for the defendant. The grounds upon which the judgment was based were that (1) the parties never entered into a contract for the sale of the rubber, (2) if they did enter into such a contract, RDC had the power to and did rescind it, and (3) in any event, plaintiff never performed the alleged contract because of its failure to obtain export permits and its failure to deliver the rubber. Banking & Trading Corporation v. Reconstruction Finance Corporation, D.C.S.D. N.Y.1956, 147 F.Supp. 193. The appellee sets up as an additional basis for denying recovery that BTC breached its express warranty of title.
 
 
 2
 A comprehensive statement of the facts is contained in the opinion of the district court. We set forth here only such facts as are relevant to our conclusion that the court below correctly held that BTC and RDC did not enter into a contractual relationship.
 
 
 3
 During 1946 there was a serious shortage of rubber in the United States, one of the causes of which was the lack of exports from Indonesia, a principal source of rubber. This situation was due to the war of independence being waged by the Indonesians against the Netherlands which had theretofore exercised sovereignty over the area. Toward the end of 1946 the Republic of Indonesia controlled, with the exception of a few seaports, the entire islands of Java, Sumatra and Madura upon which were located substantially all of the estates where rubber was produced. However, since the Netherlands Navy controlled the surrounding waters, the Dutch were able to effectively enforce a ban upon exports imposed by them upon the Republic.
 
 
 4
 During the World War and until the spring of 1947 RDC was the agency of the United States Government charged with the procurement of natural rubber, and it was the only authorized importer thereof in this country. During 1946 the procedure adopted by RDC for buying rubber was to enter into agreements providing for the general terms of sale with governments of rubber-producing nations. The actual arranging of individual transactions, however, was left to private traders within the United States who purchased the rubber from the foreign sources and then sold to RDC the rubber so acquired on terms of sale set forth in prescribed RDC form contracts. By letter dated January 24, 1947 RDC told the trade that it reserved the right to refuse to purchase any rubber "at any time prior to the actual execution of a purchase contract for the amounts shown thereon."
 
 
 5
 In January 1947 the plaintiff, an agency of the Republic of Indonesia, approached Isbrandtsen Company, an American corporation, and requested the latter to act for it in arranging the sale and carriage of Indonesian products to the United States and with the proceeds of such sales to purchase for Indonesian use American consumer goods and industrial equipment. Thereafter, on January 20, 1947, representatives of Isbrandtsen proposed to one Proctor, the vice-president of RDC, that RDC purchase certain rubber in the possession of the Republic. Though RDC was anxious to obtain the rubber, it was unable to arrange the purchase because of objections interposed by our State Department. The State Department knew, as RDC did also, that substantially all rubber coming from Indonesia had been produced on estates owned by citizens of the Netherlands that were then under the control of the Republic. Because the Netherlands had placed an embargo on all estate produce and since the United States still recognized Dutch sovereignty over all of Indonesia, the State Department informed Isbrandtsen and RDC that it was "unable to approve any action contrary to Dutch regulations * * *." Negotiations between RDC and Isbrandtsen were thus brought to a standstill.
 
 
 6
 On January 27, 1947, one week after RDC had been originally approached by representatives of Isbrandtsen, one Ryan, the general counsel of Isbrandtsen, informed two State Department officials that he had received assurances from Dutch authorities that the Netherlands government would not oppose the purchase by RDC of rubber from the plaintiff. That same day the same State Department officials met with one Zimmerman, the Netherlands East Indies Trade Commissioner in Washington, and they verified the information which they had received from Ryan. Accordingly, the State Department withdrew its previous objections to the proposed negotiations and so notified Isbrandtsen and RDC. On February 3 a representative of Isbrandtsen met with Proctor, the vice-president of RDC, and discussed terms for the purchase of the rubber by RDC. At Proctor's suggestion Isbrandtsen, on that day, submitted a written offer on plaintiff's behalf.[2] By the terms of the offer plaintiff proposed to sell RDC "up to five thousand (5000) long tons of Java rubber * * * F.O.B. ocean vessel at port or ports in Java * * *." Four days later, on February 7, the general counsel of RDC prepared a letter, approved by RDC's Executive Committee, which he sent to Isbrandtsen. This letter, which did not come to the attention of the Isbrandtsen officers handling the transaction until February 11, restated the terms of the offer and went on to add:
 
 
 7
 "We are prepared to accept this rubber on an F.O.B. steamer basis for February shipment only. If the rubber is not shipped in February it will be necessary for you to re-offer on a Cost and Freight basis. Shipment in any event must not be later than March 31, 1947. As soon as you have particulars of shipment of rubber we suggest that you prepare contracts to cover the quantity and price of the several grades shipped in accordance with the usual procedure on the F.O.B. contract form enclosed. Such contracts * * * [the enclosed contract form was RDC's printed form 22, the standard form by which it purchased rubber from American sellers] should contain the necessary qualifications to conform to the above terms."
 
 
 8
 Meanwhile, on February 8, at Cheribon, Java, the plaintiff began loading rubber aboard the S.S. Martin Behrman, a ship operated by Isbrandtsen under bareboat charter from the U. S. Maritime Commission. The loading began and continued even though Isbrandtsen had by then received information either that new regulations promulgated by Netherlands East Indies authorities prohibited the export of the rubber involved or, at the very least, prohibited it unless those authorities issued an export permit. On February 12 the master of the Martin Behrman received a radio message from Isbrandtsen, dated February 11, that the rubber he was loading had been sold to the United States Government. The record is clear, however, that loading of the rubber was not dependent upon receipt of an acceptance from RDC of Isbrandtsen's offer, for not only had the loading of the Martin Behrman started prior to the receipt by Isbrandtsen of any acceptance of its offer but the loading was to continue even if RDC refused the offer. On February 13 Isbrandtsen notified plaintiff's insurers that coverage for the rubber should cease as soon as the rubber was loaded. This is claimed to have been done in accordance with RDC's instructions to the trade to the effect that RDC's own insurance attached from the time that rubber purchased on its account was placed aboard a vessel.
 
 
 9
 On February 13, and again on February 17, Isbrandtsen notified one Sniffin, the New York Buying Agent of RDC, of the loading of a total of 3,000 tons of rubber aboard the Martin Behrman. These notifications were appropriately recorded by Sniffin. Also on February 13 Isbrandtsen modified and filled out the RDC form 22 contract which had been enclosed in RDC's letter of February 7. Modifications in the form were necessary in order to conform the contract to the terms of the previous correspondence between the parties and also because form 22 had been drawn to cover the typical situation in which the American trader was itself the seller, and not, as here, an agent of a foreign seller. The contract was then executed by one Smith, vice-president of Isbrandtsen, and mailed to Sniffin who received it on February 14. On February 17 Sniffin and Proctor, the former vice-president of RDC, who was then acting only as a consultant, discussed with Isbrandtsen certain suggestions RDC wished for revisions on its part in the contract form which Isbrandtsen had previously modified and had then executed. The suggested revisions dealt primarily with safeguards as to the quantity and quality of the rubber, shipping tolerances and shipping documents. Isbrandtsen made some, but apparently not all, of the changes Sniffin and Proctor suggested. Later that day Sniffin mailed Isbrandtsen's proposed contract to the president of RDC, together with a letter suggesting that still another change be made in the form.
 
 
 10
 The contract represented by the modified form 22 was never executed by RDC. On February 17 RDC's general counsel learned of the new Netherlands East Indies regulations. Accordingly he called Smith of Isbrandtsen and told him that RDC expected Isbrandtsen to obtain any necessary export permit and that RDC "would not do anything further until the export permit had been granted." The files of Isbrandtsen's insurance carrier contain the following notation:
 
 
 11
 "R.D.C. * * * telephoned Isbrandtsen that it would not sign contracts for purchase of rubber until Isbrandtsen had received permit from Dutch to sail."
 
 
 12
 By the end of February all the rubber had been loaded aboard the Martin Behrman. As soon as the loading was completed the Dutch naval authorities at Cheribon ordered the Martin Behrman to Batavia. At Batavia the entire cargo of the Martin Behrman was seized by the Dutch officials there, and Isbrandtsen's control thereof ceased. There is some dispute between the parties as to whether the seizure was under eminent domain or was a confiscation based upon violation of the Netherlands East Indies regulations, but we find it unnecessary to resolve that dispute.
 
 
 13
 The district court held that, although the parties were close to complete agreement, there were important details still to be settled and although the essential terms of a contract could have been spelled out after Isbrandtsen modified and filled out form 22 on February 13 the parties never became contractually bound to each other because RDC had communicated to Isbrandtsen its intent not to be bound until it executed form 22. 147 F.Supp. at page 206.
 
 
 14
 There is little dispute here concerning the applicable legal principles upon which our decision depends, but it will, nevertheless, be helpful to state those principles in order to provide a framework for our later discussion of the evidence. Here the crucial question is whether the parties intended not to be bound, or whether either of them manifested an intent to the other not to be bound, until a fully integrated contract had been executed. 1 Williston on Contracts §§ 28, 28A (Rev.Ed.1936); Restatement of Contracts §§ 25, 26; Disken v. Herter, 1st Dept. 1902, 73 App. Div. 453, 77 N.Y.S. 300, affirmed without opinion 175 N.Y. 480, 67 N.E. 1081; Smith v. Onyx Oil and Chemical Company, 3 Cir., 1955, 218 F.2d 104, 50 A.L. R.2d 216. To be sure, the fact that the parties contemplated that an integrated memorial of their agreement would be executed is not conclusive of their intent not to be bound until after execution, Restatement of Contracts § 26, but it does constitute some evidence thereof. Thus, ultimately the decision here depends upon an issue of fact. In Disken and Onyx the trier of fact found that the parties had intended to be bound prior to the execution of a formal writing. In the present case, however, the district judge found otherwise — that the parties intended not to be bound until RDC's form 22 had been executed by RDC. That finding is conclusive upon this appeal unless we find it to be "clearly erroneous." After examining the record we believe that here the district court's finding was certainly not "clearly erroneous," but rather that it was indeed in accord with the weight of the evidence.
 
 
 15
 Some of the factors to be considered in determining whether parties are bound prior to the execution of an integrated writing are suggested by the opinion of the Supreme Judicial Court of Maine in Mississippi & Dominion Steamship Co. v. Swift, 1894, 86 Me. 248, 29 A. 1063, 1067:
 
 
 16
 "* * * whether the contract is of that class which are usually found to be in writing, whether it is of such a nature as to need a formal writing for its full expression, whether it has few or many details, whether the amount involved is large or small, whether it is a common or unusual contract, whether the negotiations themselves indicate that a written draft is contemplated as the final conclusion of the negotiations. If a written draft is proposed, suggested, or referred to during the negotiations, it is some evidence that the parties intended it to be the final closing of the contract."
 
 
 17
 Other cases suggest still an additional circumstance to be considered: Whether during the negotiations the parties have fully agreed upon all of the details of the transaction, or whether pending final execution of a written document some of those details have remained unsettled. Lehigh Structural Steel Co. v. Great Lakes Const. Co., 2 Cir., 1934, 72 F.2d 229; Disken v. Herter, supra; Sanders v. Pottlitzer Bros. Fruit Co., 1894, 144 N.Y. 209, 39 N.E. 75, 29 L.R.A. 431; Upsal Street Realty Co. v. Rubin, 1937, 326 Pa. 327, 192 A. 481; 1 Williston on Contracts, supra at 63.
 
 
 18
 Consideration of each of these factors in the light of the facts of the present case clearly indicates that inasmuch as RDC did not execute the modified form contract the parties never became contractually bound. RDC's letter of February 7, in accordance with its previously stated policy, indicated that RDC would require execution of an integrated contract. There are a number of reasons why it was reasonable for RDC to insist upon this procedure, all of which reasons tend to indicate that RDC did not intend to be bound until the contract was executed.
 
 
 19
 As a government agency, RDC was subject to investigation and audit concerning the use which it made of public funds. Hence it was important that whenever RDC entered into contractual relationships its legal rights and obligations be clearly defined. This was particularly true in the instant transaction because RDC was dealing at a distance on the basis of fragmentary information furnished by Isbrandtsen. Moreover, the instant transaction differed substantially from those in which RDC was customarily involved, for here the American dealer was not the seller, but was only the agent of a foreign seller. Therefore, certain of the terms upon which RDC customarily purchased rubber were inapplicable and other terms had to be substituted. In fact, one very important contractual provision, that concerning responsibility for weights and quality, was never settled. In a transaction involving approximately two million dollars such a provision could have substantial importance. Hence we agree with the district court that even though "the essence of the contract could be spelled out by a court" after Isbrandtsen modified and executed form 22, no contract was in fact agreed to here because RDC had manifested an intent which it had communicated to Isbrandtsen not to be bound until it on its part finally had executed form 22. 147 F.Supp. at page 206.
 
 
 20
 We conclude, therefore, that RDC's letter of February 7 was neither an acceptance by RDC of plaintiff's previous offer, nor a counter-offer by RDC which might be accepted by plaintiff or by Isbrandtsen on plaintiff's behalf. We conclude that the letter of February 7 was no more than it purported to be, an indication of RDC's willingness to purchase the rubber on the terms suggested by Isbrandtsen, but also subject to certain additional terms. It is of significance that the letter merely stated "We are prepared to accept this rubber * * *." This language might under other circumstances be sufficiently promissory in nature to form the basis of a contract, but in a case such as this where substantial contractual provisions were still open, where one of the parties was a government agency with an express established policy of consummating contracts only upon integrated forms, and where the February 7 letter itself indicated that an integrated form was to be first prepared by Isbrandtsen and when so prepared submitted to RDC for approval and execution, we think that the language cannot be so understood.
 
 
 21
 Since we hold that negotiations between the parties never culminated in a contract, plaintiff's action was properly dismissed.
 
 
 22
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 Reconstruction Finance Corporation, the original defendant and parent corporation of RDC, was dissolved during the pendency of this appeal. By order of this court, dated October 4, 1957, the Administrator of General Services was substituted as appellee
 
 
 [2]
 The offer reads as follows:
 "For account of Perseroan Bank dan Perniagaan [plaintiff's Indonesian name] of Djokjakarta, Java, we hereby offer you up to five thousand (5000) long tons of Java rubber at one-eighth (1/8) cents off the standard base price of R.M.A. established types as determined on inspection on arrival at United States ports by an authorized Crude Rubber Inspector. This offer is made F.O.B. ocean vessel at port or ports in Java destined for continental U.S.A. ports.
 "We understand the present price for standard ribbed smoked sheets, R.M.A. No. 1 rubber, under quota, is twenty and one-quarter (20.25) cents per pound F.O.B.
 "Freight will be at full present conference rate of $25.00 per 50 cubic feet plus 15%. All insurable risks to be covered by and for account of buyer.
 "We expect this rubber to come forward on our American SS `Martin Behrman' from Cheribon and Probolinggo, Java, and that the vessel will be ready at first loading port about February 6th, 1947.
 "Kindly confirm your acceptance of this offer."
 
 
 
 23
 HINCKS, Circuit Judge (concurring).
 
 
 24
 I not only concur in Judge WATERMAN'S opinion but would also base affirmance on the ground that even if a valid contract had been made the contract had been rescinded for the reasons stated in Judge Walsh's lucid opinion below. 147 F.Supp. 193, at pages 207 and 208. On February 3, 1947 when Isbrandtsen wrote its "offer" to RDC both parties were mistaken as to the state of the Netherlands export regulations. For Isbrandtsen was not informed of the "new" regulations until February 4 and RDC not until February 17. Consequently if RDC's reply of February 7th be deemed an acceptance which brought a contract into effect, there was a mutual mistake as to a fact plainly material and the contract was voidable under the Restatement of Contracts § 502. If, however, a contract be deemed to have come into effect when Isbrandtsen accepted the counteroffer contained in RDC's letter of February 7, Isbrandtsen's continued failure to disclose to RDC the new Netherlands export regulations was not privileged under § 472(1) (b) of the Restatement and consequently its non-disclosure had the effect of a material misrepresentation under § 472(2). As such it was cause for rescission under § 476(1) of the Restatement. See Corbin on Contracts, Vol. 3, § 610.