**REPROSYSTEM, B.V., and N. Norman Muller, Plaintiffs-Appellees, and Cross-Appellants,**

v.

**SCM CORPORATION, Defendant-Appellant, and Cross-Appellee.**

No. 1228, Dockets 83–7011, 83–7067.

United States Court of Appeals, Second Circuit.

Argued June 2, 1983.

Decided Feb. 2, 1984.

Peter Fleming, New York City (Scott J. McKay Wolas, Bernard J. Rhodes, Curtis, Mallet-Prevost, Colt & Mosle, New York City, Bernard J. Nussbaum, Sonnenschein, Carlin, Nath & Rosenthal, Chicago, Ill., of counsel), for defendant-appellant and cross-appellee.

Selvyn Seidel, New York City (Stephen Gillers, Mark I. Silberblatt, Lee A. Pollock, Robert L. Cadoux, Hale, Russell & Gray, New York City, of counsel), for plaintiffs-appellees and cross-appellants.

Before KAUFMAN, PRATT and GIBSON *, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

Defendant SCM Corporation appeals from a judgment of the United States District Court for the Southern District of New York, Robert W. Sweet, *Judge,* awarding $1,062,000 in damages to plaintiffs Reprosystem, B.V., a Netherlands corporation, and N. Norman Muller, a New York resident. 565 F.Supp. 4. The trial court found that SCM was contractually obligated to sell its six foreign subsidiaries to plaintiffs, that SCM breached the claimed contract of sale, and that even though plaintiffs would not have been able to perform the contract they were nevertheless entitled to breach-of-contract damages measured by SCM's "unjust enrichment" in the form of profits

---

* Honorable Floyd R. Gibson, of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

received from the subsidiaries during the period of negotiations between the parties. On appeal, SCM contends that there was no contract because the parties intended not to be bound unless and until a formal written contract was executed, and that none ever was. SCM further contends that there was no basis, legal or equitable, for an award of damages. Plaintiffs have cross-appealed, claiming that the district court's finding that plaintiffs were unable to perform the contract was clearly erroneous, and therefore, that they are entitled to the entire profit SCM received from its subsequent sale of the subsidiaries to others. Plaintiffs also challenge Judge Sweet's dismissal of their securities fraud and promissory estoppel claims. On the main appeal we reverse the district court's conclusions that the parties were bound by a contract and that SCM was enriched unjustly; on the cross-appeal, we affirm its dismissal of the promissory estoppel and securities fraud counts.

## I.

We first review the facts pertinent to our resolution of the appeal and cross-appeal. A more extensive exposition of the facts can be found in the district court's opinion, 522 F.Supp. 1257 (S.D.N.Y.1981).

Plaintiff Reprosystem B.V. was incorporated by plaintiff N. Norman Muller to hold the shares and assets he sought to purchase from SCM's foreign subsidiaries.

Defendant SCM is a multinational enterprise that manufactures and distributes a variety of products. In 1976 the part of its business that consisted of marketing, leasing, and servicing copy machines in Europe, Africa, and the Middle East, was conducted by SCM's International Business Equipment Division through six wholly owned subsidiaries incorporated under the laws of five foreign countries. During fiscal year 1976, the six subsidiaries together generated annual sales exceeding $40 million and profits exceeding $4 million, and had approximately one thousand employees.

In late 1975 Paul Elicker, who was president, chief executive officer, and chairman of the board of SCM, and Herbert Elgi, the vice president of finance, decided that SCM should dispose of its European copier subsidiaries. At Elicker's direction, Frank De Maio, who was vice president and general manager of the International Division, began to seek out potential purchasers.

Consistent with its decision to get out of the overseas copying business, SCM sought to minimize its commitment to any new products in that copier market. However, De Maio and William Rodich, the president of SCM's Business Equipment Division which included the International Division, recognized that SCM's zinc oxide paper process was outdated, and they concluded that regardless of ownership, the business would have to make available a plain paper copier. During the spring of 1976, therefore, De Maio traveled to Japan and reached a preliminary understanding with Mita, a Japanese manufacturer, to supply SCM with approximately 3,000 plain paper copiers.

Muller became interested in the proposed sale of the subsidiaries. He met in April 1976 with both Elicker and De Maio, and in May 1976 with Elicker and Rodich. During the May meeting Muller was provided with unaudited statements of the subsidiaries showing an asset value of approximately $16.8 million as of March 31, 1976, and a nine-month profit of approximately $3 million.

In a letter prepared without assistance of counsel Muller, on May 7, 1976, offered to pay $9 million for the SCM subsidiaries, subject to two conditions: (1) a satisfactory audit by Muller's accountants, and (2) execution of a formal agreement, satisfactory to both SCM and Muller. Rodich informed Muller that the letter provided a basis for negotiations, but that discussions would have to be suspended during a securities offering by SCM.

When negotiations resumed in August 1976, Rodich presented Muller with a list of nine points that SCM considered to be nonnegotiable. These nine points, supplemented by four more in September, became the basis for an "agreement in principle" between Muller and SCM. One provision of

the "agreement in principle" was that during negotiations the companies would be operated by SCM for the benefit of Muller, so that any profits or losses occurring after August 1, 1976 would be used to adjust the purchase price. SCM issued a press release on September 28, 1976 announcing the "agreement in principle", but stating also that "[t]he proposed sale is subject to a definitive agreement expected to be reached soon." SCM's 10–K report, filed with the SEC on September 30, 1976, also stated that SCM made "no assurance that the transaction would be completed."

The parties contemplated that the transaction would be developed in a "Global Agreement" setting out the general terms of the transaction, plus six separate agreements covering the respective details for the sales of the six subsidiary corporations. Using the "agreement in principle" as a starting point, general counsel for SCM prepared a draft model agreement for sale of one of the subsidiaries. After Muller's attorneys, Hardee, Barovick, Konecky & Braun, reviewed the draft and found it incomplete, SCM retained the firm of Sullivan & Cromwell to assist in negotiating and drafting all of the agreements.

Concentrating on the Global Agreement and a model agreement for one of the subsidiaries, Sullivan & Cromwell generated more than fifteen drafts by mid-December, each of which was reviewed by the Hardee, Barovick firm and returned for revision. Consistent with the proviso in Muller's initial offer that conditioned the contemplated transaction on execution of a formal agreement, each draft of the Global Agreement prepared by Sullivan & Cromwell provided that the obligations of each party were subject to a condition precedent that it shall have been provided with an opinion from counsel for the other party that "this [Global] Agreement and each of the Purchase Agreements has been duly authorized, executed and delivered by [the other party]".

On December 15 and 16, 1976 the parties and their attorneys met to resolve all outstanding issues. At this meeting the drafts prepared by Sullivan & Cromwell were reviewed paragraph by paragraph, including the paragraphs that required formal execution as a prerequisite to binding effect. After two days of negotiations no problems remained, the parties exchanged congratulations, and Rodich took Muller to De Maio's office where he acknowledged that the meetings had been successfully completed.

On December 17, 1976 Rodich sent telexes to the general managers of the subsidiaries: "we now feel that the problems are resolved and that the deal is made subject to approval by various government agencies." On December 27, 1976 and January 5, 1977, "final drafts" of the Global Agreement and six separate agreements were circulated by Sullivan & Cromwell. Because Rodich was being reassigned to a new post, Elgi took over the negotiations on behalf of SCM. At year's end, Elgi reviewed the proposed transaction, discovered that the subsidiaries were operating more profitably than expected, and decided that the sale was a better deal for Muller than for SCM. Elgi proposed alternatives to Elicker in a meeting on January 4, including the alternative of killing the deal with Muller and selling the subsidiaries individually. Elicker instructed Elgi to attempt to close the proposed transaction with Muller.

In January the negotiations stalled. SCM introduced new items for negotiation, fired the New York management that was supposed to be transferred to Muller intact, and discovered an accounting error which led to a substantial increase in the purchase price. Muller continued to avoid SCM's requests that he document his ability to provide the purchase price on closing. On January 20, 1977 SCM issued a press release stating that it felt free to pursue other alternatives.

On January 31 Muller wrote SCM claiming that the "final drafts" constituted binding contracts for the purchase and sale of the subsidiaries. SCM responded on February 2 by terminating the negotiations. At no time was any of the draft contracts signed by either side.

## II.

### A. EXISTENCE OF A CONTRACT

Although "[c]ontract law has progressed and evolved sounder principles since the days of ritualistic and formalistic sealed instrument requirements", *V'Soske v. Barwick*, 404 F.2d 495, 499 (2d Cir.1968), *cert. denied*, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969), there are still situations where the absence of a signed, formal agreement is fatal to an argument that a contract exists. This court summarized the alternative New York rules on this subject in *V'Soske:*

> First, if the parties intend not to be bound until they have executed a formal document embodying their agreement, they will not be bound until then; and second, the mere fact that the parties contemplate memorializing their agreement in a formal document does not prevent their informal agreement from taking effect prior to that event. * * * These rules, placing the emphasis on intention rather than form, are sensible and reasonable.

*Id.* at 499 (citations omitted).

In *V'Soske* we held that the party invoking the first rule of New York contract law described above must prove either that both parties understood they were not to be bound until the executed contract was delivered, or that the other party should have known that the disclaiming party did not intend to be bound before the contract was signed. In *V'Soske* the defendant buyer failed to prove either proposition.

Thus, the primary question on this appeal is one of intent. *Banking & Trading Corp. v. Floete*, 257 F.2d 765, 769 (2d Cir.1958). Did the parties intend not to be bound prior to execution of a formal contract? Or, did they merely contemplate that their informal agreement would be reduced to a formal writing at some later time?

In this case the trial judge determined that the parties intended to be bound by the unexecuted "final drafts" and did not intend their contractual obligations to be contingent upon their signing formal contractual documents. He wrote:

> [I]t has been determined as a matter of fact that eventually both parties intended to be bound by the Final Drafts. Taking into account the totality of the parties' objective manifestations of intent as the transaction progressed and the circumstances surrounding the negotiations, I reject SCM's contention that a final signing would be required to constitute a binding agreement. In the circumstances at bar, SCM's—indeed, both parties'—contemplation of subsequent formal signed agreements did not overcome the objective facts which established an agreement.

Thus the district judge, relying upon the second rule of *V'Soske*, concluded that the parties merely contemplated memorializing their informal agreement in a signed, formal document. This finding of fact is subject to the clearly erroneous standard of review embodied in Federal Rule of Civil Procedure 52(a). *Banking & Trading Corp. v. Floete*, 257 F.2d at 769; *see also Oswald v. Allen*, 417 F.2d 43 (2d Cir.1969) (meeting of minds is question of fact subject to Rule 52(a)). Therefore, the district court's finding that the parties intended to be contractually bound prior to execution of the formal contracts must be upheld unless it was made without adequate evidentiary support, is against the clear weight of the evidence, or was induced by an erroneous view of the law. *See* 9 Wright & Miller, *Federal Practice and Procedure: Civil* § 2585 (1971).

Our review of the entire record leaves us with the definite and firm conviction that a mistake was made by the district court, *United States v. United States Gypsum*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948), because the documents and testimony clearly showed that the intent of both parties was not to be bound prior to the execution of a formal, written contract. Therefore, the first rule summarized in *V'Soske* applies, and SCM was not bound by the "agreement in principle", by the "final drafts", or by any claimed oral

understanding reached in the course of the extended negotiations.

The uncontested evidence clearly establishes the parties' intent not to be bound prior to execution of formal contracts. Muller's initial purchase offer was made on the expressed condition that "a formal agreement, which is satisfactory to SCM and [plaintiffs] be entered into." Muller testified that Rodich "had no problem with that." Additionally, the September press release, prepared by SCM and reviewed by Muller, stated: "The proposed sale of the European copier business is subject to a definitive agreement expected to be reached soon." SCM's 10–K report, filed with the SEC in September 1976, also stated: "[SCM] makes no assurance that this transaction will be completed."

Finally, the numerous drafts of the "Global Agreement" conditioned the parties' obligations on the receipt of opinions from counsel of both buyer and seller confirming that the "[Global] Agreement and each of the Purchase Agreements have been duly authorized, executed and delivered". Draft agreements for the sale of several of the subsidiaries had similar provisions. Additionally, the drafts of the Global Agreement provided "when executed and delivered, this [Global] Agreement and each of the Purchase Agreements will be a valid and binding agreement * * * in accordance with its terms." Despite their many other differences over the proposed contracts, neither party took exception to these provisions that conditioned their binding effect on formal execution and delivery. Thus, the contract drafts, combined with the parties' other written communications, conclusively establish a mutual intent not to be bound prior to execution of the formal documents, and the district court's finding to the contrary is clearly erroneous. Its conclusion that a contract existed must, therefore, be reversed.

The result we reach is supported by prior decisions applying New York law. In *Banking & Trading Corp. v. Floete*, 257 F.2d 765, we affirmed the district court's holding that no contract existed because

defendants had circulated to dealers in the trade a letter which required executed contracts, and that the letter was sufficient to communicate the defendant's intent not to be bound. Similarly, in *ABC Trading Co. v. Westinghouse Electric Supply Co.*, 382 F.Supp. 600 (E.D.N.Y.1974), the district court held that a single reference to a written contract in a letter from defendant to plaintiff was sufficient to put plaintiff on notice and to prevent the defendant from being obligated until a formal agreement was signed. *See also Chromalloy American Corp. v. Universal Housing Systems*, 495 F.Supp. 544 (S.D.N.Y.1980), *aff'd mem.*, 697 F.2d 289 (2d Cir.1982) (offer to purchase conditioned on execution of written contract held sufficient to show intent not to be bound prior to signing); *Scheck v. Francis*, 26 N.Y.2d 466, 311 N.Y.S.2d 841, 260 N.E.2d 493 (1970) (transmittal letter showed intent not to be bound until contract signed). *Cf. Disken v. Herter*, 73 A.D. 453, 77 N.Y.S. 300 (App.Div.1902), *aff'd*, 175 N.Y. 480, 67 N.E. 1081 (1903) (where parties did not express their intent to defer binding effect until execution of formal document, oral contract held valid); *Municipal Consultants & Publishers, Inc. v. Town of Ramapo*, 47 N.Y.2d 144, 417 N.Y.S.2d 218, 390 N.E.2d 1143 (1979) (same).

■ Of equal importance, the result we reach is consistent with the realities of the complex transaction at issue. The proposed deal involved a $4 million sale of six companies which were incorporated under the laws of five different countries and which had assets of over $17 million, sales of $40 million, and profits of $4 million. Completing the transaction would require approvals of foreign governments, sales of both securities and assets, and the transfer of almost one thousand foreign employees, not to mention the myriad additional details attendant upon the sale of any business. Thus, the magnitude and complexity of the deal as reflected in the numerous written contract drafts not only reinforce the parties' stated intent not to be bound until written contracts were signed, but also reflect a practical business need to record all

the parties' commitments in definitive documents. *See Banking & Trading Corp. v. Floete*, 257 F.2d at 769; *International Telemeter Corp. v. Teleprompter Corp.*, 592 F.2d 49, 57–58 (2d Cir.1979) (Friendly, *J.*, concurring) (describing realities of modern corporate "deals"). Since the parties intended not to be bound prior to execution of those written documents and since none was ever executed, no contract came into existence.

Our conclusion that no contract existed eliminates the only basis on which Judge Sweet awarded damages to plaintiffs. Nevertheless, the plaintiffs argue on this appeal that the award can be sustained on alternative theories of unjust enrichment and breach of a duty to negotiate in good faith. We disagree.

### B. *UNJUST ENRICHMENT*

After concluding that a binding contract existed between SCM and Reprosystem, the district court addressed the question of damages, holding that because plaintiffs would not have been able to perform they were not entitled to traditional contract damages. Rather than send the plaintiffs away emptyhanded, however, the trial court awarded breach-of-contract damages measured by principles of unjust enrichment. Citing the *Restatement (Second) of Contracts* and *Corbin,* the court stated, "The remedy of restitution to prevent unjust enrichment is commonly applied both in the realm of quasi-contract and as an alternative basis for recovery upon breach of contract." The trial court held that SCM was obligated by its agreement to sell the subsidiaries to plaintiffs and that to allow SCM to breach the contract and keep all the profits from its subsequent sale of the subsidiaries to others would "condone unjust enrichment." He therefore looked to the provision in the "agreement in principle" that obligated SCM during the negotiation period to operate the subsidiaries for Muller's benefit, and he awarded to plaintiffs the $1 million in profits earned by the subsidiaries between August 1, 1976 and February 2, 1977. Thus, the basis for Judge Sweet's award of damages was SCM's

breach of the alleged contract; unjust enrichment merely provided the measure of those damages. However, our reversal of the trial court's conclusion that a contract was created removes the predicate for plaintiffs' recovery for breach of contract. We have also considered plaintiffs' claim to a recovery grounded independently in the equitable doctrine of unjust enrichment, but we find that claim to be without merit in the circumstances of this case.

■ The equitable doctrine of unjust enrichment rests, generally, on the principle that a party should not be allowed to enrich himself at the expense of another. *Miller v. Schloss*, 218 N.Y. 400, 113 N.E. 337 (1916). Under New York law, a plaintiff seeking an equitable recovery based on unjust enrichment must first show that a benefit was conferred upon the defendant, and then show that as between the two parties enrichment of the defendant was unjust. *See Indyk v. Habib Bank Ltd.*, 694 F.2d 54, 57 (2d Cir.1982).

Plaintiffs argue that Muller conferred benefits on SCM by making several contributions to preserve SCM's subsidiaries and by causing dramatic improvement in their operations and profits. These benefits, Muller claims, resulted from several trips to Europe, reviewing of financial reports, securing suppliers, arranging financing from banks, introducing key man insurance, and participating in continuing operations. The most important contribution claimed by Muller was his development of the plain paper copier program with Mita, which plaintiffs claim resulted in enormous profits to SCM, profits that would have been plaintiffs' if SCM had not killed the deal.

■ The record shows, however, that Muller's activities had little to do with the subsidiaries' successful operation during the negotiation period. Muller did take several trips to Europe in the fall of 1976, during which he discussed the subsidiaries' future with SCM foreign management and consulted with several prospective lenders and suppliers. However, there is no evidence to show that Muller actually obtained credit for ongoing financing with banks or that he

secured any suppliers other than those who were already dealing with SCM.

Equally unsupported is plaintiffs' claim that Muller contributed to the subsidiaries' success by developing the Mita plain paper copier project. As defendants argue, and as the district judge recognized, SCM at all times had a vested interest in preserving the good will of its subsidiaries and was aware that any prospective purchaser would require plain paper copiers. Thus, while SCM obviously sought to minimize its commitment to this new product line, it nevertheless made preliminary arrangements to obtain a supply of these copiers from Mita in the spring of 1976, several months before negotiations with Muller reached a serious stage. Similarly, SCM—not Muller—ordered and tested the Mita prototypes that were displayed at the October 1976 trade fair. The district judge found that it was this display, reflecting SCM's commitment to the conversion to plain paper copiers, that helped preserve the subsidiaries' sales force.

In contrast to SCM's role, Muller's involvement with the Mita project was limited to a single "letter of intent" sent to Mita in December 1976 by De Maio, who was still an employee of SCM, indicating that Reprosystem intended to purchase 3,000 plain paper copiers. This sole event, occurring near the end of the relevant time period, provides insufficient support for plaintiffs' argument that Muller's efforts with respect to the Mita project held the subsidiaries together and conferred a million dollar benefit on SCM.

We conclude that plaintiffs failed to show that they bestowed any benefit upon SCM; therefore, plaintiffs' award cannot be based on unjust enrichment. Moreover, even if we were to conclude that plaintiffs had conferred some benefit on SCM, plaintiffs have not shown that there is anything unjust about SCM's retaining the profits from SCM's businesses run by SCM's management at SCM's expense.

## C. DUTY TO NEGOTIATE IN GOOD FAITH

■ Plaintiffs also seek to justify their recovery below by claiming that SCM breached an obligation to negotiate in good faith. The district court apparently found that such a duty was created by the alleged contract between the parties, for it stated: "On the facts as I have found them, I concluded not only that SCM breached the agreements reached at the end of 1976, but that it specifically breached its duty of good faith negotiation and performance required by those agreements." However, our conclusion that no contract existed eliminates this as a possible basis for imposing such a duty on SCM.

As the district court recognized, under some circumstances a party to a contract may be bound by an implied agreement to negotiate in good faith to reach an agreement. *See Pepsico Co., Inc. v. W.R. Grace & Co.,* 307 F.Supp. 713, 720 (S.D.N.Y.1969). In this case such an agreement might be inferred from the "agreement in principle." *Compare Thompson v. Liquichimica of America, Inc.,* 481 F.Supp. 365 (S.D.N.Y. 1979). Nevertheless, whatever implied agreement that existed here was too indefinite to be enforceable under New York law. *See Joseph Martin, Jr., Delicatessen, Inc. v. Schumaker,* 52 N.Y.2d 105, 436 N.Y.S.2d 247, 417 N.E.2d 541 (1981); *Candid Productions Inc. v. International Skating Union,* 530 F.Supp. 1330 (S.D.N.Y.1982). Consequently, plaintiffs cannot succeed on the theory that they are entitled to damages because defendants breached a "duty to negotiate in good faith".

## D. PROMISSORY ESTOPPEL

■ On their cross-appeal, plaintiffs ask us to reverse the district court's conclusion that they failed to establish promissory estoppel as an alternative basis for recovery. In New York the elements of a claim for promissory estoppel are: "a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of his reliance." *Ripple's of Clearview, Inc. v. LeHavre Associates,* 88 A.D.2d 120, 452 N.Y.S.2d 447, 449 (N.Y.App.Div.1982) (citations omitted).

In our view the district court correctly ruled that plaintiffs failed to establish a promissory estoppel here. Plaintiffs can neither point to any clear and unambiguous promise made by SCM to the effect that it would consummate the deal, nor show that they reasonably relied on any promise implied from SCM's conduct during the negotiations. The negotiations of the parties as reflected in the draft agreements made it clear that the obligations of both SCM and Muller were contingent upon execution and delivery of the formal contract documents. *See Brause v. Goldman,* 10 A.D.2d 328, 199 N.Y.S.2d 606 (N.Y.App.Div. 1960) *aff'd,* 9 N.Y.2d 620, 210 N.Y.S.2d 225, 172 N.E.2d 78 (1961).

### E. *SECURITIES FRAUD*

Finally, plaintiffs urge us to reinstate their claim for violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1982), and Rule 10b–5, 17 C.F.R. § 240.10b–5 (1983), promulgated thereunder. True, the district court dismissed the securities fraud count by erroneously relying on the "sale of business" doctrine, which although adopted in other circuits, *see Frederiksen v. Poloway,* 637 F.2d 1147 (7th Cir.), *cert. denied,* 451 U.S. 1017, 101 S.Ct. 3006, 69 L.Ed.2d 389 (1981); *Chandler v. Kew, Inc.,* 691 F.2d 443 (10th Cir.1977); *King v. Winkler,* 673 F.2d 342 (11th Cir. 1982), has been rejected in this circuit, *Golden v. Garafalo,* 678 F.2d 1139 (2d Cir.1982); *see also Seagrave Corp. v. Vista Resources, Inc.,* 696 F.2d 227 (2d Cir.1982); *Coffin v. Polishing Machines, Inc.,* 596 F.2d 1202 (4th Cir.) *cert. denied,* 444 U.S. 868, 100 S.Ct. 142, 62 L.Ed.2d 92 (1979); *Daily v. Morgan,* 701 F.2d 496 (5th Cir.1983). Nevertheless, plaintiffs cannot recover for securities fraud, because they do not satisfy the "purchase or sale" requirement of *Birnbaum v. Newport Steel,* 193 F.2d 461 (2d Cir.), *cert. denied,* 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952).

Plaintiffs were not and do not claim to be actual purchasers or sellers of SCM stock. They claim only that their right to sue under Rule 10b–5 arises from the alleged contract to sell the shares of the subsidiaries, and they rely on those cases in this circuit that have held that a plaintiff can sue for fraud connected with an oral contract for the sale of securities. *See Desser v. Ashton,* 408 F.Supp. 1174 (S.D.N.Y. 1975), *aff'd mem.,* 573 F.2d 1289 (2d Cir. 1977); *Commerce Reporting Co. v. Puretec, Inc.,* 290 F.Supp. 715 (S.D.N.Y.1968).

However, because we have concluded that SCM did not enter into a contract, the plaintiffs fall outside even that enlarged class of persons who are protected by Rule 10b–5. Judge Sweet's dismissal of plaintiffs' securities fraud action is therefore affirmed.

### III.

We conclude that the district court clearly erred in finding that a contract existed between the parties, that SCM was unjustly enriched, and that SCM owed a duty to negotiate in good faith with Muller and Reprosystem. Plaintiffs have not demonstrated any other basis for liability on the facts found below. Accordingly, the judgment of the district court is reversed on the contract claim, and affirmed insofar as it dismissed plaintiffs' remaining claims.