**CHAMPION INTERNATIONAL CORPORATION, Plaintiff,**

v.

**BENNETT FOREST INDUSTRIES, INC., et al., Defendants.**

**No. CV–85–140–M.**

United States District Court,
D. Montana.

July 10, 1990.

Don Paul Badgley, Seattle, Wash., for plaintiff.

Thomas D. Cochran of Witherspoon, Kelley, Davenport & Toole, Spokane, Wash., for defendants.

MEMORANDUM OPINION

ROBERT J. McNICHOLS, District Judge, Sitting by Designation.

A bench trial in this matter was held during the week of April 23–27, 1990 in Missoula, Montana. The parties concluded their cases in Spokane, Washington on April 30th and May 10th. This memorandum opinion constitutes the court's findings of facts and conclusions of law.

I. PARTIES

Plaintiff Champion International Corporation ("Champion") is a New York corporation headquartered in Stamford, Connecticut.

Defendant Bennett Forest Industries ("BFI") is a Washington corporation. The majority shareholder in BFI is defendant Forest Transport, Inc. ("FTI"), an Idaho corporation. The majority shareholder in FTI is defendant Frank Bennett ("Bennett").

The court has jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1) (diversity of citizenship).

II. FACTS

In 1983, Champion owned two sawmill facilities located in Connor and Darby, Montana (the "facilities"). Champion wanted to sell the facilities because of high labor costs and a low timber supply in the region. Bennett and a close working companion, Tim Mueller ("Mueller"), began serious negotiations to purchase the facilities in the Spring of 1983.

Bennett and Mueller met with Champion officials on June 14, 1983 at Champion headquarters in Stamford, Connecticut. Champion representatives included: Robert Conley, Vice–President; Mr. Lowery, Executive Vice–President; Ken Frank, in-house counsel; and Mr. Birchfield, Executive Vice–President of Champion's Timberlands

Division.[1] In the words of defendants' counsel, the "major players" were present.

In Stamford, the parties discussed terms of the purchase, including the fact that BFI would be formed and would be the purchaser; Bennett wanted financial information on the facilities relating to operational costs; a purchase price of $3 million was agreed to with terms of payment to be negotiated; Champion wanted personal guarantees by Bennett and his wife, and corporate guarantees by FTI; Bennett advised Champion that BFI wanted a two-year guaranteed supply of timber for the facilities;[2] Bennett wanted to pay $160 per thousand board feet for the existing log inventory located at the facilities; Bennett wanted Champion to assign to BFI five U.S. Forest Service timber sales which Champion had purchased; Bennett wanted Champion's employees terminated before BFI took over operations; Champion wanted to use a logging shop at the facilities for one year; and various other terms. After these discussions, it was agreed that Champion's in-house counsel, Ken Frank ("Frank") would contact Bennett's attorney, John Thornton ("Thornton"), to work out details of an Asset Purchase Agreement ("Agreement").

Frank and Thornton exchanged various proposals and drafts over the several weeks following the Stamford meeting. A meeting was eventually scheduled for July 15, 1983 at Thornton's office in Seattle.

Champion sent Bill Butler, now retired, to the July 15th meeting as its representative. Before the meeting, Butler stopped at the airport to pick up some additional documents sent by Frank which were to be exhibits to the Agreement. Included in these documents was a letter drafted by Frank. This letter was to be signed by Butler and delivered to Thornton at the July 15th meeting. This letter provided:

"This agreement is signed in principle and our attorneys *may have changes to the Exhibits and non-substantial changes* to the Agreement on Monday, July 18, or Tuesday, July 19, 1983."

*see* Plaintiff's Ex. 23. (emphasis supplied).[3]

Butler delivered the letter to Thornton upon arrival at the meeting. Present were Butler, Frank and Delores Bennett, Mueller, and Thornton. The exhibits were placed on a table in a conference room. Butler announced that he did not have authority to make any changes in the Agreement.

Butler and Bennett, at the direction of Thornton, sat across from one another at the table. The Agreement and exhibits were reviewed page by page. Interlineations were made and pages were initialed. According to Bennett, the initialing was done to signify that each party had seen the documents and identified problem areas.

It quickly became apparent to Bennett and Mueller that some of the provisions in the Agreement and exhibits did not reflect what had been agreed to during the negotiation process. Disagreement existed, *inter alia*, over the following matters:

(1) *Timber supply:* The Agreement contained reference to four, not five, U.S. Forest sales which Champion was to assign to BFI. (Agreement pp. 7–9).

(2) *Log and unfinished lumber inventory price:* The Agreement said $180, rather than $160 per thousand board feet which BFI was to pay for the existing log and unfinished lumber inventory at the time of closing. This would have resulted in a significant additional cost to the defendants at closing. (Agreement pp. 6–7).

(3) *Mobile home:* Bennett testified that a mobile home located at the Darby facility was to be included as part of the deal

---

**1.** Champion's Timberland Division is responsible for obtaining adequate resource—timber—to "wood" Champion sawmill facilities.

**2.** Timber supply is critical for a sawmill to successfully operate in the Bitteroot Valley where the mills are located. Most of the timber in that area is located on National Forest land and is only available on a limited basis through sales

conducted by the U.S. Forest Service. Champion owned some fee lands in the Valley, which would have allowed Champion to meet Bennett's demand for a two year supply of timber.

**3.** The "exhibits" were substantial and covered important factors in the negotiations.

because Mueller was to live in it. The Agreement did not reflect this arrangement.

In addition to the protests made by Bennett, Thornton also questioned certain provisions of the agreement. Thornton advised Bennett and Butler that he was not satisfied that a certain lease which was to be part of the deal was in order. This lease, the "Shook" lease, was important because it entitled Champion to the use of additional land at the facilities. Thornton also complained of "as is, where is" language relating to the assets which BFI was purchasing because Bennett and Mueller had not been able to inspect most of the equipment to be included in the deal. (Agreement p. 4). Butler replied that he did not know why the fifth timber sale was missing or why the log inventory price was now $180 per thousand board feet, and that in any event he did not have authority to change any provision of the Agreement. Butler advised Bennett to follow up on any discrepancies with the appropriate Champion officials.

After one hour, the parties finished reviewing the papers. Butler then insisted that Bennett sign the Agreement. Bennett and Thornton protested. Butler insisted that the Agreement be signed as a good-faith indication that the deal was going forward. Bennett agreed on that basis and both he and Butler placed their signatures on the Agreement. Butler then wrote on the front page of his copy of the Agreement:

**"SIGNED 7–15–83 COULD BE SOME CHANGES WEB"**

Although the parties signed the Agreement, Bennett did so on behalf of BFI. Butler did not request Bennett to sign security agreements, personal and corporate guarantees, promissory notes, or mortgages which were supposedly to be a part of the transaction.

At the end of the meeting Thornton gave Butler a letter addressed to Frank, which stated in part:

"The signing by each party was an indication that substantial agreement had been reached concerning the terms and conditions of purchase, *subject to final review by the attorney for each party.* The parties intend to make *necessary modifications* on July 18 and July 19, 1983 and close the sale on July 22, 1983 in Missoula, Montana."

*see* Plaintiff's Ex. 24 (emphasis supplied).

Butler left the meeting, called Champion headquarters, and advised Mr. Conley that the parties had a "done deal".

In contrast, Bennett instructed Mueller to immediately proceed to Montana to investigate the missing fifth timber sale, the dispute in log and unfinished lumber inventory price, and the other problems which had surfaced at the July 15th meeting. Mueller left for Montana, and Bennett proceeded to Spokane where he met with his bankers to make certain that if the deal was to close he had adequate financing.[4]

Mueller first drove through the log yard at the facilities upon his arrival in Montana. Mueller noted immediately that less than 1 million board feet of logs were in the log deck inventory. He became alarmed because Champion had agreed to have 2 to 2.5 million board feet of logs in inventory when BFI took over operations. Mueller learned that deliveries intended for the facilities had been diverted to another Champion mill in Missoula, Montana.

Mueller next met with Bill Kelly ("Kelly"), one of several independent loggers who were under contract to supply Champion with logs at the facilities. Kelly was to supply logs to BFI at the same price he was supplying Champion as part of the agreement reached during negotiations between Champion and defendants. Mueller learned from Kelly that the volume of logs which he could deliver to BFI was less than

---

**4.** During the negotiation process and following the meeting, various steps were taken by the parties to prepare for the change in ownership of the facilities. Mueller had placed an employment ad in the local newspaper. Utility companies were contacted regarding changes of account names. Champion even initiated the termination process by holding meetings with its employees.

Champion promised [5], and that his logging costs were $175 per thousand board feet. Mueller's concern heightened upon learning this since Kelly's logging costs were higher than quoted by Champion, and would preclude BFI from obtaining future log inventories at $160 per thousand board feet.

Mueller next contacted Bob Simes, a Champion procurement official at the facilities. Simes was unable to give Mueller a definitive answer to the log inventory or the log price problem.

Mueller then met with Harold Hopwood, manager of the facilities. Hopwood advised Mueller that a problem existed on a title matter involving an encroachment of an office building on a state highway right-of-way. This discovery also alarmed Mueller.

After investigating and attempting to resolve the problems which had surfaced during the July 15th meeting, Mueller contacted Bennett by telephone. Mueller told Bennett that he was frustrated because he could not get Champion officials to resolve the problems of timber supply and log costs. Mueller was extremely concerned that BFI would be unable to make a profit because (1) BFI could not obtain sufficient resource to "wood" the mills, and (2) BFI would have to pay an additional $20 per thousand board feet for the logs that would be delivered. Based on these factors, along with the problems associated with the newly discovered encroachment issue, mobile home issue, and other problems, Mueller advised Bennett that he was not comfortable with the deal. Bennett then advised Mueller he was coming to Montana.

Bennett arrived in Montana on July 19th and proceeded directly to the facilities with Mueller. Based upon a review of the entire situation, Bennett called Thornton in Seattle. After discussing the unresolved problems, including the bleak outlook on the critical issues of timber supply, inventory price, and future log costs, Bennett told

Mueller to advise Champion that the deal was off. Mueller did so.

Champion advised Bennett by letter shortly after the deal was terminated that it considered the termination a breach of contract. Champion continued to run the facilities and in December, 1984, sold them to another buyer for $2 million. This lawsuit followed.

## III. POSITIONS OF THE PARTIES

### A. Plaintiff's position

Champion asserts that the Agreement signed by Bennett and Butler on July 15th is a detailed, integrated contract as a matter of law. Champion takes the position that the Agreement obligated the parties to conduct a closing within fifteen days. On the closing date, money would have been paid, BFI and the Bennetts would have executed notes and guaranties in substantially the same form provided for in the agreement, and title to assets would change hands.

Champion contends that the final nature of the Agreement, combined with the parol evidence rule, prohibits the court from considering any testimony by Bennett, Mueller, and Thornton which deviates from the provisions of the Agreement. In particular, Champion argues that the parol evidence rule would be violated if the court were to consider testimony as to the following:

(1) *Log/unfinished lumber prices:* the Agreement references $180 at Plaintiff's ex. 32–68. Champion contends this eliminates consideration of any testimony about the price being $160.

(2) *Missing timber sale:* the Agreement references only four sales at Plaintiff's ex. 32–69. Champion contends this eliminates consideration of any contrary testimony.

(3) *Volume of log inventory:* Champion contends that testimony that two million board feet was to be in the inventory at closing, and testimony of a two year guar-

---

**5.** Champion told Mueller that Kelly could deliver 5 million board feet. Kelly told Mueller he

could only deliver 3.5 million board feet.

antee of logs, are attempts to add terms to the Agreement and cannot be considered.

Champion contends that because the defendants wrongfully terminated the Agreement, it should be awarded damages. Champion wants damages for the difference between the net present value of the Bennett contract and the value of the contract under which the facilities were ultimately sold—$901,504. Champion also requests damages in the amount of $449,138 for the losses it suffered as a result of operating the facilities for the period of July, 1983, to the time the facilities were sold in December 1984. Champion also requests reimbursement for various other expenses incurred in mitigating its losses.

As to liability for damages, Champion takes the position that the corporate veil of BFI should be disregarded to hold FTI liable, and that FTI's corporate veil be disregarded to hold the Bennetts personally liable.

### B. Defendants' position

Defendants contend that the Agreement is far from being final and binding. They cite the letters exchanged by the parties at the July 15th meeting as proof that *both* parties understood changes could be made, and that no final deal could occur until closing on July 22nd. Defendants' understanding at the end of the July 15th meeting was that the parties had simply moved a step closer to a final deal.

Contrary to Champion's contention that the signing of the Agreement and initialing of pages signified a final agreement, defendants vigorously assert that the most important provisions, timber supply and log costs, in no way resembled the parties agreement. Additionally, the initialling of the agreement and exhibits was done simply as a means of signifying that the documents had been reviewed, and the Agreement was executed as a sign of good-faith at Champion's insistence.

### IV. DISCUSSION

The major question here is whether the signed Agreement is a valid and binding contract. Before addressing this question,

the court will briefly address whether Montana or Washington law governs the issue of contract formation, and the role of the parol evidence rule.

### A. Law Governing Contract Formation

Champion asserts that Washington law governs the formation issues. Champion contends that because the Agreement selects Montana law as the governing law, and Montana law provides that the law of the place where the contract was made governs the issue of contract formation, Washington law must be applied to the formation issue because the parties met and signed the agreement in Seattle on July 15th. Defendants apparently contend that Montana law governs all relevant issues in this case.

The court is convinced after reviewing the relevant law of both Montana and Washington that Champion's argument that Washington law governs the contract formation issues here is an argument without a distinction. The same basic principles govern contract formation in both states.

### B. Parol Evidence Rule

Champion referenced the parol evidence rule throughout the course of trial and in its memoranda. The parol evidence rule prohibits the court from considering parol evidence to add to, vary, or contradict the terms of an integrated contract between the parties. *see Bond v. Wiegardt*, 36 Wash.2d 41, 216 P.2d 196 (1950) and/or *Montana Code Annotated 28-2-905*. Champion concedes, however, that the parol evidence rule presupposes an action based upon a valid contract, and that the rule has no application to extrinsic evidence offered to show that a writing in the form of a contract never became operative as a contract. see *Bond*, 36 Wash.2d at 48, 216 P.2d 196 (and citations therein); *see also* MCA 28-2-905(1)(b).

### C. Is There a Contract?

To form a binding contract, Washington and Montana law require a "mutual

assent" or "meeting of the minds" on all essential elements or terms. *see Chadwick v. Giberson,* 190 Mt. 88, 92, 618 P.2d 1213, 1215 (1980); *Pacific Cascade Corp. v. Nimmer,* 25 Wash.App. 552, 555–56, 608 P.2d 266 (1980). The requisite mutual assent or meeting of the minds must be based upon an objective manifestation of mutual intent on the essential terms of the contract. *Id.* In short, the parties must be agreeing to the same bargain at the same time.

Contrary to Champion's contentions, there is no final and binding contract between the parties. An objective review of the facts warrants this conclusion.

Two of the significant events which occurred at the July 15th meeting were (1) the exchange of letters by the parties,[6] and (2) Butler's announcement that he did not have any authority to make changes in the Agreement.

The letter delivered by Butler objectively reeks of Champion's intent to avoid being trapped into any "final" deal on July 15th. The reference in the letter that Champion's attorneys *may have changes to the Exhibits and non-substantial changes* to the Agreement on Monday, July 18, or Tuesday, July 19, 1983 warrants a conclusion that Champion reserved a right to refuse to go forward if it so decided, and reserved a right to make changes at a date *subsequent* to the July 15th meeting. The fact that Champion reserved to itself these rights, along with the fact that it sent a representative to the meeting who had no authority to make any changes in the Agreement, is objective evidence that Champion never intended the July 15th meeting to be the time or place for the parties to execute a final agreement. The letter and Butler's announcement that he

lacked authority set the tone for what the July 15th meeting objectively was—a chance for the parties *for the first time face-to-face* to review documents, assess the stage they were at in the negotiation process, and to prepare work agendas setting forth matters which needed to be addressed prior to closing.

The lack of a final, binding contract on July 15th is further demonstrated by the letter from Thornton to Frank which was hand-delivered to Butler at the close of the meeting. Much like the letter Butler delivered at the start of the July 15th meeting, Thornton's letter signified that the defendants were not going to be locked into any deal until all problems were resolved prior to closing. The delivery of non-committal letters by each party on July 15th meeting is objective proof that there was not a "done deal" at the end of the meeting.

Admittedly, the signing of the Agreement and initialling of the exhibits by Bennett and Butler raises a question of whether the defendants assented to the provisions as they existed in the Agreement on July 15th. The court is satisfied, however, that Bennett signed the Agreement only after having expressed his position that the deal was far from being final. This is borne out by Butler's notation on the front page of his copy of the Agreement, "could be some changes". Bennett's sole motivation for signing the Agreement was Butler's insistence that Champion have a good-faith indication of the defendants' intent to proceed forward. As to initialling the various documents, the parties were doing so to signify that each document had been reviewed and discussed. The signing and initialling did not constitute mutual assent to the Agreement as it existed on July 15th.

---

**6.** The term "signed in principle" was in the letter Butler delivered at the meeting. This phrase by itself raises doubts as to the binding effect of the Agreement. In *Reprosystem, B.V. v. SCM Corp.,* 727 F.2d 257 (2d Cir.) *cert. denied,* 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984), the Second Circuit was confronted with a document designated as an "agreement in principle". This agreement was definitive and contained all of the negotiated terms of a contract. The terms of the contract were so firmly

agreed to that the *defendant* went so far as to issue a press release announcing the "agreement in principle". The defendant later decided, however, not to sign a formal agreement. The Second Circuit found that the parties were contemplating a final agreement to be executed at a later date. The court held as a matter of law that the term "agreement in principle", along with an agreement to close the deal at a later date, left the parties unbound until the closing. 727 F.2d at 261–63.

Other areas of disagreement which were communicated to Champion on July 15th objectively warrant a conclusion that a binding contract was not in place that day. On the critical issue of timber supply, Butler could not explain at the meeting why the Agreement only provided for assignment of *four* timber sales; he could only refer defendants to other Champion officials to obtain an answer. Bennett was extremely concerned about the absence of the fifth timber sale, and justifiably so in light of the undisputed facts that (1) he had made it abundantly clear to Champion officials during the Connecticut meeting that he would not enter into an agreement unless he had an adequate timber supply to "wood" the facilities, (2) Champion officials had agreed to assign five timber sales, and (3) Champion had acknowledged that the timber supply in the Bitteroot Valley is tenuous and that an adequate resource base is critical to the success of a sawmill. The absence of the fifth timber sale from the Agreement, Butler's lack of knowledge as to why it was absent, and Bennett's vow to investigate further, provide clear and objective evidence that mutual assent on what was probably the most important provision of the agreement was absent on July 15th.

The absence of mutual assent on July 15th was again apparent on the important issues of log and unfinished inventory price, the status of the mobile home, and "as is, where is" language relating to equipment. Bennett advised Butler that the Agreement did not accurately reflect the result of previous negotiations on the issues of inventory price and the mobile home, and at Thornton's advice wanted to look at the equipment before accepting it on an "as is, where is" basis. Butler again claimed ignorance and inability to remedy inconsistencies between the Agreement and previous negotiations. Bennett told Butler that he would have Mueller investigate the disputed areas in an attempt to resolve all problems before any closing would be consummated. Bennett's decision to send Mueller to Montana to investigate the problem areas, along with the letter delivered to Butler at the end of the meeting, is objec-

tively consistent with his position that no final deal existed.

Another significant fact which warrants a conclusion that a final, binding agreement did not exist was that Butler did not ask the Bennetts to execute personal guarantees, or corporate guarantees on behalf of FTI, at the July 15th meeting. Champion concedes that it would not have agreed to sell the facilities without these guarantees. These guarantees were important to Champion because it was keenly aware BFI was a newly formed corporation with capitalization of only $5000. To claim now that a final agreement was in place without procuring these guarantees is inconsistent with Champion's claim that the July 15th meeting resulted in a "done deal". Even if the court were to stretch the facts here in an attempt to find a binding contract, the only party which could possibly be liable to Champion is BFI. Bennett and FTI did not execute the Agreement, and did not execute guarantees.

Champion cites various steps taken by the parties in preparation for a change in ownership of the mill as evidence of a final deal. These included Bennett arranging for financing following the July 15th meeting; Mueller placing an ad in the local paper and contacting utility companies to arrange for a change in account names; and Champion's initiation of the termination process of its employees. While such steps are relevant to the inquiry of whether a contract existed, they do not have the significance which Champion asserts. First, there is no doubt that the defendants were hopeful that the problems of the fifth timber sale, etc. could be cleared up after the July 15th meeting by Mueller's contact with Champion officials. In fact, Bennett wanted the negotiations to result in the acquisition of the facilities, and he signed the Agreement as a good-faith indication of proceeding on the deal if the problem areas could be worked out. Second, it is difficult to imagine that a skilled businessman such as Mr. Bennett would negotiate a complex $3 million transaction without such preparatory actions. Both Champion and defendants contem-

plated that the deal would close on one day, defendants would take over the facilities the next day, and Champion would be out of the picture at that time. The preparatory steps taken by the defendants here were in *anticipation* of ironing out all problem areas so that a final deal could be consummated at the time of closing.

Although it is clear that the parties had no binding contract, Champion's position on damages warrants comment. Champion requested damages for the difference between the price Bennett was to pay and that which was ultimately obtained when the facilities were sold in December 1984. Champion also requested damages for losses incurred while operating the facilities after the Bennett transaction terminated. If a binding contract had existed, the defendants would have a strong argument that Champion's damage theory is excessive because Champion reasonably could have halted production and salvaged the value of the physical assets. That type of mitigation would have significantly reduced the damages asserted by Champion at trial. Moreover, Champion operated at a profit between July 15, 1983 and October 1, 1983. Losses then began to occur. What all of this means is not clear.

## V. SUMMARY

An objective review of the facts here requires the court to hold in favor of the defendants on the basis that the parties did not enter into a valid, binding contract. The court concludes that both parties recognized at the July 15th meeting that there were critical matters yet unresolved. Instead of a final agreement existing between the parties, the bottom line in this case is that the entire transaction bristles with indicia of negotiations.[7] While the parties may have been close to a final deal on July 15th, contract they did not.[8]

The court finds for the defendants. The clerk is instructed to enter judgment in favor of the defendants and provide coun-

sel with copies of this memorandum opinion.

IT IS SO ORDERED.

---

**7.** A phrase the court would like to take credit for, but one which was coined by Judge Beeks in *Ginsberg v. Commissioner of Internal Revenue*, 305 F.2d 664 (2nd Cir.1962).

